754 F.2d 1381
 117 L.R.R.M. (BNA) 2974, 118 L.R.R.M. (BNA) 3022,
102 Lab.Cas. P 11,233
 WHISPER SOFT MILLS, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Pacific Northwest District Council, International Ladies
Garment Workers Union, AFL-CIO, Intervenors.
NATIONAL LABOR RELATIONS BOARD, Cross-Petitioner,
v.
WHISPER SOFT MILLS, INC., Cross-Respondent.
PACIFIC NORTHWEST DISTRICT COUNCIL, INTERNATIONAL LADIES
GARMENT WORKERS UNION, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 83-7717, 83-7813 and 83-7840.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 13, 1984.
Decided Oct. 31, 1984.
As Modified on Denial of Rehearing and Rehearing En banc
March 11, 1985.
 
 Stefan M. Mason, Mason & Mason, Los Angeles, Cal., Sanford N. Nathan, Neyhart, Anderson, Nussbaum, Reilly & Freitas, San Francisco, Cal., for petitioner.
 Susan Williams, Elliott Moore, NLRB, Washington, D.C., for respondent.
 Petition to Review a Decision of the United States National Labor Relations Board.
 Before MERRILL, ALARCON, and NELSON, Circuit Judges.
 MERRILL, Circuit Judge:
 
 
 1
 Petitioner, Whisper Soft Mills, Inc., seeks review of a decision and order of the National Labor Relations Board. Whisper Soft contends that the NLRB erred in finding that (1) the Pacific Northwest Council of the International Ladies Garment Workers Union, AFL-CIO [the Council] possessed the authority of an authorized bargaining representative; (2) that Whisper Soft's delay in advancing a wage proposal constituted a refusal to bargain in violation of the National Labor Relations Act, 29 U.S.C. Secs. 158(a)(5) and (1); and (3) that Whisper Soft's withdrawal of recognition of the International Ladies Garment Workers Union [ILGWU] violated Secs. 158(a)(5) and (1) of the Act, converting an existing economic strike into an unfair labor practice strike. The Council has been granted leave to intervene. Jurisdiction over the final order of the Board is based on 29 U.S.C. Sec. 160(f).
 
 
 2
 * On November 29, 1979, the ILGWU was certified as the representative of the production employees at Whisper Soft's Santa Rosa, California facility. Contract negotiations between Whisper Soft and the Council began on January 15, 1980. After twelve bargaining sessions, a strike against the company commenced on August 25, and six more sessions were held between September 2 and November 14. On December 16, Whisper Soft withdrew recognition from the ILGWU, claiming to have a good faith doubt that the union continued to represent a majority of the employees in the bargaining unit. Since that time, no bargaining has occurred.
 
 
 3
 Throughout the period during which bargaining took place, Whisper Soft manifested concern that the Council was not the certified bargaining representative. At the second bargaining session on February 20, the Council proposed an agreement solely between the Council and the Company. Whisper Soft asked that the ILGWU sign and be bound by the agreement. The Council did not agree, stating that this suggestion presented problems.
 
 
 4
 When the parties next met on March 11, the company asked that one of the Council's representatives sign any agreement in her capacity as a vice-president of ILGWU and obtain a letter from the ILGWU authorizing her to negotiate and binding the international union to the agreement. The Council made no response.
 
 
 5
 At the fourth negotiating session on March 17 and 18, the issue arose again. The Council indicated that the ILGWU did not want to be a party to any agreement due to a desire to avoid liability in the event of a later breach. Whisper Soft responded that the Council's position raised legal problems because only the ILGWU was the certified bargaining representative. The company continued negotiating under the stated assumption that it was dealing with a representative of the ILGWU. Whisper Soft warned, however, that legal problems might arise if the parties were unable to reach an agreement on the representation issue.
 
 
 6
 At the September 4 bargaining session, the issue arose once again. Whisper Soft stated that any agreement was to be between the ILGWU and the company, signed by an officer of the ILGWU per certification. Later in the meeting, the Council's chief negotiator stated that to have the ILGWU as the signatory to the contract would be an embarrassment to the Council. On September 5, Whisper Soft reiterated its position.
 
 
 7
 Against this background of uncertainty as to the presence of the certified representative, negotiations transpired concerning the terms of a collective bargaining agreement. The company asserted that its policy was to grant wage increases in September, when customer prices were raised. Whisper Soft further maintained that a wage offer could not be immediately forthcoming because of a decrease in business necessitating the layoff of employees.
 
 
 8
 On August 20, Whisper Soft made a wage proposal, and five days later the employees struck. The company reacted by hiring permanent replacements, and on December 16, approximately thirteen months after the ILGWU had been certified, Whisper Soft informed the Council that the company had a good faith doubt as to whether a majority of the bargaining unit employees supported the union. On that basis, recognition was withdrawn by Whisper Soft.
 
 
 9
 A complaint alleging violation of Secs. 158(a)(5) and (1) of the Act was brought against Whisper Soft by the General Counsel of the NLRB. An Administrative Law Judge found that the company's delay in making a wage proposal was based upon legitimate business considerations. The withdrawal of recognition from the union was found to be lawful. The employees' strike was, therefore, stated neither to have been caused nor prolonged by unfair labor practices. Because the company was found not to have violated the Act, the Administrative Law Judge did not decide whether the Council was the agent of the ILGWU for the purpose of bargaining.
 
 
 10
 The National Labor Relations Board reversed the decision of the Administrative Law Judge. The Board refused to dismiss the case because of the attempt by the Council to obtain its name, and not that of the ILGWU, as signatory to the contract. Whisper Soft was then found to have refused to bargain in violation of 29 U.S.C. 158(a)(5) and (1) by unjustifiably delaying bargaining. Due to this finding of unlawful delay, the Board extended, by the duration of the delay, the one-year period during which a certified representative is irrebuttably presumed to retain the support of the bargaining unit. The company's withdrawal of recognition fell, due to the extension of the bargaining year, within the period during which majority support is presumed. A prima facie violation of Secs. 158(a)(5) and (1) of the Act resulted, and the economic strike which began on August 25 was thereby converted into an unfair labor practice strike on December 16[1]. All striking workers who were not permanently replaced before December 16 were found entitled to reinstatement. In addition, the Board ordered the company to recognize and bargain collectively with the union as the exclusive representative of its employees.[2]
 
 II
 
 11
 The Board's order is to be enforced if the Board correctly applied the law and if the Board's findings of fact are supported by substantial evidence on the record viewed as a whole. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 487-88, 71 S.Ct. 456, 463-65, 95 L.Ed. 456 (1951); NLRB v. Big Bear Supermarkets, 640 F.2d 924 (9th Cir.), cert. denied, 449 U.S. 919, 101 S.Ct. 318, 66 L.Ed. 147 (1980). This standard does not change when the Board and the Administrative Law Judge make contrary findings; the Administrative Law Judge's findings are part of the record to be weighed along with all other evidence. See Idaho Falls Consolidated Hospitals, Inc. v. NLRB, 731 F.2d 1384 (9th Cir.1984).
 
 III
 
 12
 The duty of an employer to bargain with the chosen representatives of his employees in respect to rates of pay, wages and hours and other conditions of employment is an obligation only to the certified bargaining representative. See 29 U.S.C. Sec. 159(a) (1978). The obligation, being exclusive, exacts a "negative duty to treat with no other." Medo Photo Supply Corp. v. National Labor Relations Board, 321 U.S. 678, 683-84, 64 S.Ct. 830, 832-33, 88 L.Ed. 1007 (1944).
 
 
 13
 In order to assert that Whisper Soft had a duty to bargain with the Council, the Council must therefore cloak itself in the authority of an authorized bargaining representative.[3] The certified representative was, however, not the Council, but the ILGWU.
 
 
 14
 For purposes of determining the identity of the authorized representative, the local union is distinguishable as a legal entity from its international parent.[4] As the Court of Appeals for the District of Columbia Circuit recognized, "where the International has been certified, an employer could hardly be held guilty of an unfair labor practice for failing to recognize a local union which was not certified." International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America v. NLRB, 394 F.2d 757, 761 (D.C.Cir.), cert. denied, 393 U.S. 831, 89 S.Ct. 100, 21 L.Ed.2d 102 (1968). "An uncertified organization," the court continued, "cannot ... inject itself, or be injected by a friendly parent, into a labor relationship where there is a certification, in the face of the statutory provisions as to exclusiveness, certification, etc. [footnote omitted.]" 394 F.2d at 761.
 
 
 15
 The National Labor Relations Act and, in particular, the exclusive representation requirement strive to bring stability to the process by which labor and management resolve their differences. See, e.g., Abood v. Detroit Board of Education, 431 U.S. 209, 220-21, 97 S.Ct. 1782, 1791-92, 52 L.Ed.2d 261 (1977); S.Rep. No. 573, 74th Cong., 1st Sess. (1935). A strict distinction between the local and the international union for the purpose of determining the authorized representative is necessary in order to bring this policy to fruition. Serious consequences to the labor relations framework adopted by Congress would result if local unions were allowed to inject themselves into negotiations in place of a certified international. The employer could be confronted by a well financed international union in the campaign preceding the representation election. If the ensuing collective bargaining agreement was signed only by the local and only on the authority of the local, the international could shield itself from any liability for a subsequent breach of the agreement. The position of the international union would thus be greatly strengthened in dealing with employers; the international would be able to exert considerable influence in the election campaign without risking liability in the administration of any later collective agreement.
 
 
 16
 Allowing the breakdown in the distinction between the local and the international would also undermine the position of labor unions and reduce the benefits to employees from collectivization. Employers would be able to offer separate peace settlements to locals and thereby avoid more stringent international demands. See NLRB v. General Electric Company, 418 F.2d 736, 755 (2d Cir.1969), cert. denied, 397 U.S. 965, 90 S.Ct. 995, 25 L.Ed.2d 257 (1970). An international union, having organized an entire industry or a multi-plant employer, might face a strategy of divide and conquer.
 
 IV
 
 17
 Despite the necessity for retaining a clear distinction between the Council and the ILGWU in identifying the authorized bargaining representative, the international union is by no means barred from delegating bargaining authority to members of a local. In general, a union may select whomever it wants, including officers and members of other unions, as representatives in dealings with an employer. General Electric Co. v. NLRB, 412 F.2d 512, 517 (2d Cir.1969). Members of a local are not barred from serving a certified international as designated representatives. Cf. Prudential Insurance Co. of America v. NLRB, 278 F.2d 181, 182-83 (3d Cir.1960).
 
 
 18
 Whether the Council members were in fact delegated authority to negotiate on behalf of the ILGWU is a question of agency law.[5] For an agency relationship to exist, the agent must consent to act on behalf of the principal. Nelson v. Serwold, 687 F.2d 278, 282 (9th Cir.1982); Grace Line, Inc. v. Todd Shipyard Corp., 500 F.2d 361, 373 (9th Cir.1974); Restatement (Second) of Agency Sec. 1(1) (1958). The agent's consent must be manifest and is evidenced by, inter alia, the actual dealings between the parties. Johnson v. Bechtel Associates Professional Corp., 717 F.2d 574, 579 (D.C.Cir.1983), cert. granted, --- U.S. ----, 104 S.Ct. 972, 79 L.Ed.2d 210 (1984).
 
 
 19
 The behavior of the Council is inconsistent with the existence of any consent. An essential characteristic of an agency is the power of the agent to commit his principal to business relationships with third parties. Griffin v. United States, 588 F.2d 521, 528 (5th Cir.1979). See, e.g., Esmond Mills v. Commissioner, 132 F.2d 753, 755 (1st Cir.), cert. denied, 319 U.S. 770, 63 S.Ct. 1432, 87 L.Ed. 1718 (1943); Restatement (Second) of Agency Sec. 12 (1958). An agent can by nature bind his principal to a transaction with a third person. See Restatement (Second) of Agency Sec. 140 (1958). A party without this capacity to bind the principal is not an agent. The statement that the ILGWU did not want to be a party to any agreement due to a desire to avoid liability was in effect a claim by the Council not to be an agent of the ILGWU. The Council cannot, therefore, be regarded as having consented to any agency status.[6]V
 
 
 20
 The Council being neither an authorized representative nor an agent of an authorized representative, the company had no duty to bargain with the Council.[7] In the absence of a duty to bargain, any failure by Whisper Soft to put forward a wage proposal cannot result in an illegality. Because the company was not guilty of any unfair labor practice prior to August 25, the strike which began on that date was not an unfair labor practice strike at its inception.
 
 VI
 
 21
 The sole remaining issue is whether the company's withdrawal of recognition of the union on December 16 violated Secs. 158(a)(5) and (1) of the Act and converted the strike into an unfair labor practice strike. The rationale advanced by the Board was that the year during which a union is presumed to retain majority support in a bargaining unit, see Brooks v. NLRB, 348 U.S. 96, 104, 75 S.Ct. 176, 181, 99 L.Ed. 125 (1954), had been extended due to Whisper Soft's delay in making a wage proposal. The company's withdrawal of recognition had therefore fallen within the time period during which a union is presumed to retain majority support. Since we have held, however, that Whisper Soft's method of making a wage proposal did not result in any illegality, the certification year should not have been extended. The withdrawal of recognition therefore did not fall within the period of time during which a union is irrebuttably presumed to enjoy majority support.
 
 
 22
 At the expiration of the certification year, the presumption of majority status becomes rebuttable. An employer may rebut that presumption, so as to withdraw recognition, by presenting evidence of a sufficient objective basis for a reasonable doubt of the union's majority status at the time the employer refused to bargain. See Retired Persons Pharmacy v. NLRB, 519 F.2d 486 (2d Cir.1975). Such objective evidence must be clear, cogent, and convincing. See Pioneer Inn Associates v. NLRB, 578 F.2d 835 (9th Cir.1978).
 
 
 23
 The company argued that its good faith belief in a lack of majority status was premised on the fact that, at the time recognition was withdrawn, a majority of the unit was comprised of employees who had applied for work in response to an advertisement which informed them of the company's labor dispute and who had crossed the picket line daily to work for the company.[8] The Administrative Law Judge acknowledged that the mere fact that other employees crossed the line to work does not evidence and is insufficient to establish a good faith belief in a loss of majority status because new employees are presumed to support the union in the same ratio as the old. See Pennco, Inc., 250 N.L.R.B. 716 (1980). Yet the Administrative Law Judge found unique circumstances which would rebut the ancillary-ratio presumption and lead to the conclusion that none of the new employees was loyal to the Union: throughout the strike, the Union demand that Whisper Soft reinstate all of the strikers as a condition of any collective bargaining agreement, thereby resulting in a loss of employment for a majority of the new employees. Accordingly, the Administrative Law Judge concluded that the company did have an objective basis for doubting the Union's majority status.[9]
 
 
 24
 This Court has found employee turnover to be a factor which may be considered in determining whether there is an objective basis for a doubt of majority support for the union. See Dalewood Rehabilitation Hospital, Inc. v. NLRB, 566 F.2d 77 (9th Cir.1977). Moreover, the presumption that strike replacements support the union in the same ratio as strikers has never been embraced by any circuit court and has been rejected by the four circuits that have considered it. See NLRB v. Pennco, Inc., 684 F.2d 340 (6th Cir.1982), cert. denied 459 U.S. 994, 103 S.Ct. 355, 74 L.Ed.2d 392 (1982); Soule Glass & Glazing Co. v. NLRB, 652 F.2d 1055 (1st Cir.1981); National Car Rental System, Inc. v. NLRB, 594 F.2d 1203 (8th Cir.1979); and NLRB v. Randle-Eastern Ambulance Service, Inc., 584 F.2d 720 (5th Cir.1978). Against this background, the Administrative Law Judge did not err in finding that Whisper Soft reasonably concluded that the Union no longer enjoyed majority status.[10] No unfair labor practice therefore occurred.
 
 
 25
 The decision of The National Labor Relations Board is reversed and its order is vacated.
 
 
 
 [1]
 The Board affirmed the Administrative Law Judge's finding that the strike was not caused by the delay in making a wage offer and that the strike was therefore economic at its inception
 
 
 [2]
 The Administrative Law Judge also found that the company did not refuse to furnish wage and benefit information concerning its supervisory employees. This finding was affirmed by the Board and is not contested in the Council's petition for review
 
 
 [3]
 Respondents view the question of whether the Council or the ILGWU would be signatory to the agreement as a permissive bargaining issue. This analysis is, however, beside the point. If the Council had no authority to act as or on behalf of the authorized representative, then petitioner had no duty to bargain with the Council
 
 
 [4]
 That members of the Council's bargaining committee had formal ties to the ILGWU is irrelevant. If the members were willing to sign only in the name of the Council, they were not part of the ILGWU for purposes of the negotiations
 
 
 [5]
 Questions of agency under the Act are generally resolved according to common law principles. NLRB v. Local 64, Falls Cities District Council of Carpenters, 497 F.2d 1335, 1336 (6th Cir.1974). Cf., Carbon Fuel Co. v. United Mine Workers of America, 444 U.S. 212, 217, 100 S.Ct. 410, 414, 62 L.Ed.2d 394 (1979) (In suits for violations of contracts between an employer and a labor organization, the common law of agency governs in determining whether any person is acting as the agent of another person); NLRB v. Int. Long and Ware. Union, et. al., 283 F.2d 558, 563 (9th Cir.1960)
 
 
 [6]
 At the hearing before the Administrative Law Judge, Jackson, one of the negotiators for the Council, testified that she had the authority to sign contracts on behalf of the ILGWU. As the foregoing discussion has indicated, however, the creation of an agency relationship is a two-way street. The grant of authority by the principal is necessary but not sufficient; the agent must still consent. Whatever authority Jackson generally possessed did not suffice to make her an agent during the Whisper Soft negotiations. Furthermore, the statement by a Council negotiator that to seek explicit authority from the ILGWU would be embarrassing raises doubts as to whether the principal had actually granted authority. The Administrative Law Judge made no finding as to whether such a grant was made
 
 
 [7]
 The decision of the NLRB, that the attempt by the Council to obtain its own name as signatory did not warrant dismissal of the case, places great weight on the fact that Whisper Soft "continued to negotiate with the representatives who arrived to bargain with it." The Board seems to be implying a sort of estoppel or waiver theory to bar Whisper Soft's claim that the Council was not the authorized representative. On the present facts, any theory of estoppel or waiver is inappropriate. Throughout the negotiations, Whisper Soft made clear that unless the Council could bind the ILGWU, legal problems would arise. The company asserted that negotiations were continuing on the assumption that the Council would ultimately obtain agency status. Furthermore, given the important considerations which underlie the exclusive representation rule, the degree to which waiver or estoppel might be recognized in this context is uncertain
 
 
 [8]
 All twenty-seven production employees at Whisper Soft's Santa Rosa facility went on strike on August 25, 1980. The Administrative Law Judge evaluated continued majority status by including in the bargaining unit all strikers, even if permanently replaced, as well as permanent replacements. See NLRB v. Windham Community Hospital, 577 F.2d 805, 813 (2d Cir.1978); C.H. Guenther & Son, Inc. v. NLRB, 427 F.2d 983, 986-87 (5th Cir.), cert. denied, 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 246 (1970). The Administrative Law Judge then found that on December 16, 1980, the date the company withdrew recognition, the unit consisted of fifty-eight employees: twenty-four strikers, twenty-seven strike replacements and seven other employees who were hired during the strike. The figure of twenty-four strikers was reached by subtracting from the group of twenty-seven original strikers one striker who had explicitly abandoned the strike and moved out of the area and two strikers who had been discharged for picket line misconduct
 
 
 [9]
 Because the Board found an unlawful delay sufficient to toll the certification period, it had no opportunity to review the Administrative Law Judge's analysis concerning objective basis for doubt of the Union's majority status
 
 
 [10]
 The Union suggests that there may have been room for both the strikers and the replacements so as to undermine a good faith belief in a loss of majority status. Yet the findings of the Administrative Law Judge belie that contention inasmuch as the company maintained in several instances throughout negotiations that there was insufficient demand to immediately rehire all strikers in light of the replacements. See, e.g., NLRB v. Randle-Eastern Ambulance Service, Inc., 584 F.2d 720 (5th Cir.1978) (generally fair to assume that strike replacements do not support the union and should not be counted toward union majority)