**1128**

NATIONAL LABOR RELATIONS
BOARD, Petitioner,

Printing Specialties District Council
Number 2, as successor to Printing Specialties District Council Number 1, Petitioner–Intervenor,

v.

LITTON FINANCIAL PRINTING DIVISION, A DIVISION OF LITTON BUSINESS SYSTEMS, INC., Respondent.

PRINTING SPECIALTIES DISTRICT
COUNCIL NUMBER 2, as successor to
Printing Specialties District Council
Number 1, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Nos. 88–7065, 88–7079.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 11, 1989.

Decided Jan. 16, 1990.

**1130**

David A. Fleischer, N.L.R.B., Washington, D.C., for petitioner, respondent.

David A. Rosenfeld, Van Bourg, Weinberg, Roger & Rosenfeld, San Francisco, Cal., for petitioner-intervenor.

M.J. Diederich, Beverly Hills, Cal., for respondent.

Before FARRIS, BOOCHEVER and HALL, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

In No. 88–7065, the National Labor Relations Board ("NLRB" or "the Board") seeks enforcement of an order it issued against employer Litton Financial Printing Division ("Litton") on November 6, 1987. In No. 88–7079, Printing Specialties District Council Number 2 ("the Union"), petitions this court for review of the same Board order. The instant dispute arose in 1980 when Litton decided to close down the "cold-type" printing operation in its Santa Clara, California, plant, to expand its more efficient "hot-type" operation in the same plant, and to lay off ten employees who had worked primarily on "cold-type" equipment. At that time, the last of a series of collective bargaining agreements ("CBAs") had expired and Litton was refusing to recognize or bargain with the Union.

In the proceedings below, the Board found that Litton violated sections 8(a)(5) and 8(a)(1) of the National Labor Relations Act ("NLRA" or "the Act") by refusing to bargain over the layoffs, by directly dealing with the laid-off employees over severance pay, by refusing to accept or process grievances filed to protest the layoffs as violative of seniority rights, and by effectuating a wholesale repudiation of its obligations under the contractual grievance-arbitration provisions. To remedy these unfair labor practices, the Board issued a "cease and desist" and limited backpay order. The Board also ordered Litton to process the layoff grievances through the first two steps of the grievance-arbitration procedure, to bargain over the layoff decision, and to post appropriate notices. The Board declined, however, to order Litton to arbitrate the layoff grievances.

On appeal, Litton argues: (1) that the layoff was not a mandatory subject of bargaining, and that it had fulfilled its statutory obligation to bargain over the "effects" of the layoff decision; (2) that the grievance-arbitration provisions of the CBA expired in October of 1979 along with the contract or, at a minimum, had become ineffective by the time the grievances were filed almost a year later; (3) that the Board erred in finding a wholesale repudiation by Litton of its obligations under the grievance-arbitration process contained in the expired CBA.

In its appeal, the Union argues that the Board erred in its interpretation of section 8(a)(5) by relying on case law under section 301 of the Act, 29 U.S.C. § 185, to hold that the layoff grievances in this case are not encompassed within Litton's duty to arbitrate post-expiration grievances that "arise under" the expired CBA. The Union further maintains that the correct legal framework for analyzing an employer's refusal to process and arbitrate post-expiration or hiatus grievances is under the case law holding that an employer violates section 8(a)(5) by imposing a unilateral change in a term or condition of employment, i.e., a "mandatory subject of bargaining," without bargaining to impasse. Accordingly, the Union seeks reversal of the Board's order insofar as it declined to compel arbitration of the layoff grievances.

I

Most of the facts relevant to decision of this appeal are undisputed or were found

by an administrative law judge ("ALJ") in a hearing held on March 19, 1981. The employer in this case, Litton Financial Printing Division, is a division of Litton Business Systems, Inc., in the business of printing bank checks. Printing Specialties District Council Number 2 is the successor to the exclusive bargaining representative for the production and maintenance employees at Litton's plant in Santa Clara, California, the only one of six Litton printing facilities involved in this case. Beginning in 1974, Litton and the Union were parties to successive CBAs. The last such contract expired on October 5, 1979.[1]

Prior to August 1980, Litton used both cold-type and hot-type printing processes at its Santa Clara plant; its other five plants used only the hot-type process. In July 1980, Litton decided to convert the Santa Clara facility to an entirely hot-type operation after one of its major customers, Wells Fargo Bank, canceled 30 per cent of its cold-type print orders. A Litton representative testified that this decision was based on four factors: (1) the loss of the Wells Fargo and other customer orders; (2) the greater economy of the hot-type process by which more checks could be printed on a single sheet of paper; (3) the increased flexibility to have other Litton plants take over the Santa Clara plant's work in emergencies; (4) the reduction in training, research and development, and equipment costs. To accomplish the planned conversion, Litton transferred some of its cold-type work to other plants, sold some of its cold-type equipment, and acquired additional hot-type equipment.

■ The instant dispute arose on August 29 and September 2, 1980, when Litton laid off ten of the 42 workers in the Santa Clara plant bargaining unit. Seven of the laid-off employees had worked exclusively on cold-type equipment; the other three had worked primarily, but not exclusively, on cold-type equipment. The layoffs were uncontrovertedly effectuated without notice to the Union, and were not in accordance with seniority. In fact, six of the eleven most senior employees in the Santa Clara bargaining unit were among those laid off. Litton dealt directly with the individual laid-off employees to give them severance pay without giving notice to or bargaining with the Union over that issue.[2]

The affected employees notified the Union of the layoffs; the Union, in turn, filed separate but identical grievances for each one alleging "unjust layoff ... out of seniority." By letter dated September 24, 1980, the Union's business agent notified Litton that the grievances had been filed by the shop steward, and requested that the employer meet with Union representatives to discuss the layoff and its impact on the senior employees who were dismissed. The Union also requested that the laid-off employees be reinstated pending resolution of the grievances. In a letter dated November 10, 1980, the Union reiterated its

1. Sections 19 and 21 of the expired CBA contained a three-step grievance-arbitration procedure which provided:

"Differences that may arise between the parties hereto regarding this Agreement and any alleged violations of the Agreement, [and] the construction to be placed on any clause or clauses of the Agreement shall be determined by arbitration in the manner hereinafter set forth [in section 21]."

In a rather unusual provision, section 21 goes on to describe the three steps of the grievance-arbitration procedures, but also contains its own "no-strike clause" which provides that "there shall be no suspension or interruption of work on account of [an employee grievance as to the interpretation or application of the terms of this Agreement]...." There is a general "no-strike clause" in section 20 that is expressly limited to "the term of this Agreement."

With respect to layoffs, the CBA provided that:

"Whenever [the] Employer intends to lay off all or part of his employees, he shall give notice of such intention no later than quitting time of the previous working day. It is also understood that in case of layoffs, lengths of continuous service will be the determining factor if other things such as aptitude and ability are equal."

2. No exceptions were filed by Litton to the ALJ's finding that this direct dealing violated section 8(a)(1) and 8(a)(5) of the NLRA. Litton's failure to contest this finding in its brief, constitutes a waiver. *NLRB v. Nevis Industries, Inc.,* 647 F.2d 905, 908 (9th Cir.1981). The portion of the Board's order based on this finding is entitled to summary enforcement under section 10(e) of the Act. 29 U.S.C. § 160(e).

demands to utilize the grievance-arbitration procedures and bargain about "both the decision to layoff the workers and the effects upon those employees," and requested relevant information.

Litton refused to process the layoff grievances, maintaining that it had no obligation to do so because the CBA containing the grievance and arbitration procedures had expired. Although it expressed a willingness to bargain over the "effects" of the layoffs, Litton has consistently refused to bargain over the "decision" to lay off the ten employees.

On these facts, a majority of the Board panel found, in agreement with the ALJ, that Litton was obligated to continue processing grievances during the hiatus period under its expired agreement. The Board also ruled that Litton's refusal to do so constituted a wholesale repudiation of its contractual obligations under the grievance and arbitration provisions of the expired contract and was, therefore, a violation of sections 8(a)(5) and 8(a)(1) of the Act.

The Board also decided, contrary to the ALJ, that Litton's obligation to bargain about the effects on unit employees of its decision to convert its Santa Clara operation from cold-type to hot-type processes included a duty to bargain about its decision to lay off the ten employees. The Board, therefore, concluded that Litton's refusal to bargain upon demand by the Union over these mandatory subjects of bargaining was a further violation of sections 8(a)(5) and 8(a)(1) of the Act.

In its order, the NLRB required Litton to cease and desist from engaging in the unfair labor practices found. The Board also ordered Litton, upon the Union's request, to: (1) process the layoff grievances under the first two steps of the grievance procedure found in the expired CBA; (2) bargain with the Union over the layoffs as effects of its decision to convert to a hot-type operation; (3) pay backpay to the ten laid-off employees in accordance with *Transmarine Navigation Corp.*, 170 N.L.R.B. 389 (1968), *on remand from* 380 F.2d 933 (9th Cir.1967); and (4) post appropriate notices. The Board and the Union jointly

seek enforcement of the Board's order as heretofore described.

In the portion of its order challenged by the Union, the Board declined to order Litton to arbitrate the layoff grievances. The Board asserted that these grievances, which were based on conduct occurring after the CBA expired, did not "arise under" the contract and that Litton, therefore, had no legal or contractual obligation to arbitrate them.

## II

In general, an order of the National Labor Relations Board must be enforced if the Board correctly applied the law, and if the Board's findings of fact are supported by substantial evidence on the record viewed as a whole. *Oil, Chemical & Atomic Workers Int'l Union, Local 1-547 v. NLRB*, 842 F.2d 1141, 1143 n. 1 (9th Cir.1988); *Whisper Soft Mills, Inc. v. NLRB*, 754 F.2d 1381, 1384-85 (9th Cir. 1984).

## III

Sections 8(a)(5) and 8(d) of the National Labor Relations Act require an employer to bargain with its employees' exclusive bargaining representative over "terms or conditions of employment." 29 U.S.C. §§ 158(a)(5) and 158(d). Congress has assigned to the NLRB the primary task of interpreting these provisions. *Ford Motor Co. v. NLRB*, 441 U.S. 488, 495, 99 S.Ct. 1842, 1848, 60 L.Ed.2d 420 (1979). Because the classification of bargaining subjects for purposes of section 8(d) of the Act is " 'a matter concerning which the Board has special expertise,' " an NLRB conclusion that a matter is a mandatory subject of bargaining within the meaning of section 8(d) is entitled to considerable deference. *Id.* (quoting *Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 685-86, 85 S.Ct. 1596, 1599-1600, 14 L.Ed.2d 640 (1965)); *see also NLRB v. Financial Institution Employees of America Local 112*, 475 U.S. 192, 202, 106 S.Ct. 1007, 1012, 89 L.Ed.2d 151 (1986) (recognizing the Board's broad authority to interpret provisions of the Act

and the courts' traditional deference to Board constructions that are not irrational or inconsistent with the Act).

This court should not, moreover, reject a reasonably defensible construction by the Board of section 8(d) merely because we would prefer a different view of the statutory provision. *Ford Motor Co.*, 441 U.S. at 497, 99 S.Ct. at 1849. Such a construction must be upheld unless the proper legal standard was not applied, or the Board failed to give the plain language of the standard its ordinary meaning, or the Board's interpretation is fundamentally inconsistent with the structure of the Act and an attempt to usurp major policy decisions properly made by Congress, or the Board has moved into a new area of regulation which Congress has not committed to it. *Id.*

The Supreme Court has held that the language of section 8(d) "plainly cover[s] termination of employment." *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 210, 85 S.Ct. 398, 402, 13 L.Ed.2d 233 (1964). In particular, layoffs have consistently been held to be a mandatory subject of bargaining, and unilateral layoffs by employers violate section 8(a)(5). *Local 512, Warehouse and Office Workers' Union v. NLRB*, 795 F.2d 705, 710–11 (9th Cir.1986). *See also NLRB v. Carbonex Coal Co.*, 679 F.2d 200, 204 (10th Cir.1982); *Gulf States Manufacturers, Inc.*, 261 N.L.R.B. 852, 853, 864 (1982), *enf'd in pertinent part*, 704 F.2d 1390, 1395–99 (5th Cir.1983). Litton argues, however, that there is no duty to bargain about layoffs that are "closely related to" or "naturally follow" from a management decision that is not itself a mandatory bargaining subject. Litton acknowledges only a duty to bargain over the "effects" of such layoffs, and contends that it has always been and remains willing to meet with the Union to discuss that issue.

Litton was not required to bargain with the Union about its economically-motivated decision to convert from cold-type printing to a hot-type process in its Santa Clara plant. *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 686, 101 S.Ct. 2573, 2584, 69 L.Ed.2d 318 (1981). The Court in *First National Maintenance* squarely faced and rejected an argument that such a management decision to shut down part of a business was a mandatory subject of bargaining. It reasoned that the harm that was likely to the employer's need of freedom to decide whether to shut down part of its business, purely for economic reasons, outweighed the incremental benefit that might have been gained through the union's participation in making the decision. *Id. Cf., Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. at 215, 85 S.Ct. at 405 (management decision to replace employees in existing bargaining unit with those of independent contractor to do the same work under similar conditions is a mandatory subject of bargaining).

Just as clearly, however, Litton was required to bargain with the Union in this case over the "effects" of its decision to discontinue its cold-type printing operation. The Court in *First National Maintenance* repeatedly emphasized that it was not disturbing case law embodying the well-established principle that employers are required, as part of the "effects" bargaining mandated by section 8(a)(5), to bargain in a meaningful manner and at a meaningful time about "matters of job security" that arise in connection with a partial closing. 452 U.S. at 677–78 n. 15, 101 S.Ct. at 2580 n. 15; *id.* at 681–82, 101 S.Ct. at 2582 (citing *NLRB v. Royal Plating & Polishing Co.*, 350 F.2d 191, 196 (3d Cir.1965), and *NLRB v. Adams Dairy, Inc.*, 350 F.2d 108 (8th Cir.1965), *cert. denied*, 382 U.S. 1011, 86 S.Ct. 619, 15 L.Ed.2d 526 (1966)).[3]

---

**3.** At this point in its opinion, the Court in *First National Maintenance* seemed to be including "'termination of employment which ... necessarily results' from closing an operation" within the scope of mandatory "effects" bargaining over "matters of job security." 452 U.S. at 681, 101 S.Ct. at 2582 (quoting *Fibreboard*, 379 U.S.

at 210, 85 S.Ct. at 402). A very narrow reading of *First National Maintenance* would be that only the precise decision to terminate its contract with Greenpark was nonbargainable, and that the Court meant to require the employer to bargain about discharging employees who had worked at the Greenpark facility. As Litton

In fact, the Court declared in a footnote, "There is no doubt that petitioner [First National Maintenance] was under a duty to bargain about the results or effects of its decision [to close down part of its business], or that it violated that duty." 452 U.S. at 679 n. 15, 101 S.Ct. at 2580–81 n. 15.

The question for decision here then is whether the Board could reasonably conclude, after *First National Maintenance,* that a layoff following a conversion or partial-closing decision, such as the one involved in this case, is a mandatory subject of bargaining as an "effect" of the nonbargainable management decision. In this case, unlike *First National Maintenance,* the termination of employees by layoff was not the inevitable consequence of the underlying management decision. Litton had numerous, and admittedly feasible, alternatives [4] that it could have explored with the Union to avoid or reduce the scope of the layoff without having to reconsider its conversion decision. Litton suggests no reason other than labor costs for preferring the layoff over any of the suggested alternative courses of action; to the extent the layoff was motivated by a desire to reduce labor costs, it was amenable to bargaining. *First National Maintenance,* 452 U.S. at 680, 101 S.Ct. at 2581. While not disposi-

tive, these facts distinguish the instant case from the situation in *First National Maintenance* and support the Board's conclusion.

There was, moreover, no evidence that Litton's decision was, or had to be, made with any extraordinary speed, flexibility, or secrecy, or that bargaining about the layoff would have impeded any other important business interest recognized by the Court in *First National Maintenance.* 452 U.S. at 682–83, 101 S.Ct. at 2582–83. In these circumstances, the benefit to labor-management relations of such bargaining almost certainly outweighed the burden it would have imposed on the conduct of Litton's business.

The Board reasonably concluded that the layoff at issue in this appeal was a mandatory subject of bargaining as an "effect" of the nonbargainable decision to convert from cold-type to exclusively hot-type printing. Accordingly, we will enforce the Board's order to the extent it found Litton's refusal to bargain about the layoff decision to be a violation of sections 8(a)(5) and 8(a)(1), and sought to remedy this unfair labor practice.

■■■ In addition to asserting both a "due process" [5] and a "waiver" [6] defense to

---

observes, such a narrow reading of *First National Maintenance* approaches absurdity.

The Court almost certainly viewed the two decisions, in the circumstances of that case, as one and the same. For example, the Court stated that the case before it concerned a "management decision ... that had a direct impact on employment, since jobs were *inexorably eliminated* by the termination" of part of the employer's business operations. 452 U.S. at 677, 101 S.Ct. at 2580 (emphasis added). The Court also distinguished the employer's "decision to terminate its Greenpark service operation and its consequent discharge of the employees" from "the effects of the termination." 452 U.S. at 671, 101 S.Ct. at 2576.

A better reading of *First National Maintenance* is that on the facts presented to the Court—*i.e.,* that the employer contracted to provide its customers with maintenance services, hired personnel separately for each customer, and did not transfer employees between locations—the decision to terminate the contract with a particular customer, the Greenpark nursing home, was essentially identical to the decision to terminate its employees who had provided Greenpark with

maintenance services. The only meaningful "effects" bargaining required in such a case would be over matters such as severance pay. *See* 452 U.S. at 677–78 n. 15, 101 S.Ct. at 2580 n. 15.

4. The Board recognized the following alternatives that Litton could have pursued: retraining the "cold-type" employees to work on the new hot-type equipment; transferring the displaced senior employees to its other plants or other positions within the same plant; going to a shortened workweek, or employing a system of rotating layoffs, to divide the remaining work among all the employees. All of these alternative courses of action would have been consistent with the decision to convert to a "hot-type" printing operation, and could have been discussed without calling into question the underlying management decision.

5. There is no merit in Litton's argument that the Board's finding of a section 8(a)(5) violation under a theory different from the one alleged in the complaint constitutes a denial of due process. The Board found that Litton committed an unfair labor practice "by failing to bargain

6. See note 6 on page 1135.

the charge that its refusal to bargain over the layoffs violated sections 8(a)(5) and 8(a)(1), Litton argues that it in fact fulfilled any bargaining obligations by offering to discuss "the effects of the layoff." Despite two requests by the Union to meet and discuss *both* the layoffs and their effects, Litton offered in its letter of November 3, 1980, only to bargain over the "effects of the layoffs." The evidence in the record supports the Board's finding that Litton "was not willing to bargain over the layoff as such."

with the Union over the ... layoffs as effects of its decision to convert ... to an exclusively hot-type operation." This conduct was almost precisely the same as the conduct alleged to be unlawful in paragraph 14(b) of the General Counsel's complaint, to wit, "Since ... October 3, 1980, ... [Litton] has failed and refused to bargain with the Union ... with respect to [its] decision to lay off the [ten named] individuals...." Paragraph 15 of the complaint alleged that this conduct constituted a violation of the employer's duty to bargain in good faith under sections 8(a)(5) and (1) of the Act.

The complaint, moreover, was in compliance with the Board's Rules and Regulations, which require "a clear and concise description of the acts which are claimed to constitute unfair labor practices." *See* 29 C.F.R. § 102.15(b). The complaint specified the "act"—a refusal to bargain about the decision to lay off employees—which was claimed, and ultimately found, to be an unfair labor practice.

Finally, as the Board convincingly demonstrates, the theory under which the Board ultimately found a violation of the Act—*i.e.,* that the layoff decision was a mandatory subject of bargaining as a separable effect of the non-bargainable conversion decision—was fully litigated before the Board. The Board properly found that the complaint put Litton on notice of the issues to be litigated, and was more than adequate to satisfy due process requirements.

6. Litton's argument that the Union, either by contract or conduct, "waived" its right to bargain over the layoffs in this case is meritless. In general, a contractual waiver of the right to bargain about a mandatory subject of bargaining must be in clear and unmistakable language. *American Distributing Co. v. NLRB,* 715 F.2d 446, 450 (9th Cir.1983), *cert. denied,* 466 U.S. 958, 104 S.Ct. 2170, 80 L.Ed.2d 553 (1984). There is simply no such language in the parties' expired CBA. Contractual silence on the Union's right to bargain about layoffs, moreover, cannot be construed as a waiver. *See NLRB v. Southern California Edison Co.,* 646 F.2d 1352, 1366 (9th Cir.1981).

The fact that, on a few occasions in the past, Litton had laid off small numbers of employees without bargaining is also insufficient to show

IV

We turn next to the question whether the Board reasonably concluded that an employer's general repudiation of its obligation to arbitrate post-expiration grievances that "arise under" the expired CBA constitutes a violation of sections 8(a)(5). The NLRB has held, in reliance on *Nolde Bros. v. Local No. 358, Bakery & Confectionary Workers Union,* 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977),[7] that a general repudiation of a binding contractu-

"waiver by inaction." To establish such a defense, Litton was required to show that the Union had clear notice of its intentions sufficiently in advance of any actual layoff to allow a reasonable opportunity to bargain. *American Distributing Co.,* 715 F.2d at 450.

Finally, even if the Union had waived its right to bargain about previous layoffs by not protesting them, it would not have thereby waived its right to bargain about the more extensive layoffs here. *See NLRB v. Miller Brewing Co.,* 408 F.2d 12, 15 (9th Cir.1969) (a right once waived is not lost forever; each time the bargainable event occurs the Union has the election of requesting negotiations or not). Whatever the Union might have done with respect to prior layoffs, it unequivocally requested bargaining as to this particular layoff.

7. *Nolde* was an action under "section 301," 29 U.S.C. § 185, to compel an employer to arbitrate a severance pay dispute that arose when, during post-expiration negotiations, the employer informed the union that it was closing its plant in response to the union's strike threat. The Court held that termination of a CBA does not automatically extinguish a party's contractual obligation to arbitrate grievances arising under the contract. 430 U.S. at 250–51, 97 S.Ct. at 1071–72. Noting that termination of the CBA "would have little impact on many of the considerations behind [the parties'] decision to resolve their contractual differences through arbitration," 430 U.S. at 254, 97 S.Ct. at 1073, and that there was a strong presumption of arbitrability of disputes over the meaning and effect of collective-bargaining agreements, the Court concluded:

"The parties must be deemed to have been conscious of this policy when they agree[d] to resolve their contractual differences through arbitration. Consequently, the parties' failure to exclude from arbitrability contract disputes arising after termination, far from manifesting an intent to have arbitration obligations cease with the agreement, affords a basis for concluding that they intended to arbitrate all grievances arising out of the contractual relationship. In short, where the dispute is over a

al obligation to arbitrate grievances arising after expiration of a collective bargaining agreement violates an employer's duty to bargain under section 8(a)(5) of the NLRA, 29 U.S.C. § 158(a)(5). *Indiana & Michigan Electric Co.*, 284 NLRB No. 7, 1986–87 NLRB Dec. (CCH) ¶ 18,748 (May 29, 1987).

Under *Indiana & Michigan*, an employer must approach hiatus grievances on an *ad hoc* basis, distinguishing those that are arbitrable under *Nolde* from those that are not. *UPPCO, Inc.*, 288 NLRB No. 98, 1987–88 NLRB Dec. (CCH) ¶ 19,405 (May 12, 1988). Only those grievances that "arise under" the CBA are presumptively arbitrable. *Indiana & Michigan*, 1986–87 NLRB Dec. (CCH) at ¶ 32,054. A dispute based on post-expiration events "arises under" the CBA, under the Board's view, only if it "concerns contract rights capable of accruing or vesting to some degree during the life of the contract and ripening or remaining enforceable after the contract expires." *Id.*

■■■■■ In this appeal, the Union has launched a broad-based attack on the fundamentals of the Board's *Indiana & Michigan* decision.[8] Basically, the Union contends that the Board, in *Indiana & Michigan*, has perpetuated a long-standing error

in its analysis of unfair labor practice charges brought to remedy an employer's refusal to arbitrate post-expiration grievances. Rather than relying on section 301 precedent such as *Nolde*, the Union maintains that the Board should be analyzing such charges under the "unilateral change doctrine" of *NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). *See also Stone Boatyard v. NLRB*, 715 F.2d 441, 444 (9th Cir.1983), *cert. denied*, 466 U.S. 937, 104 S.Ct. 1910, 80 L.Ed.2d 459 (1984); *NLRB v. Carilli*, 648 F.2d 1206, 1214 (9th Cir.1981).

In essence, the *Katz* doctrine is that an employer who fails to maintain the status quo with respect to "terms and conditions of employment" after a CBA expires, and imposes unilateral changes in a mandatory subject of bargaining before bargaining to agreement or impasse over the relevant term or condition of employment, commits an unfair labor practice—a refusal to bargain—in violation of section 8(a)(5). Because an arbitration procedure is incontrovertibly a mandatory subject of bargaining, *see Indiana & Michigan*, 1986–87 NLRB Dec. (CCH) at ¶ 32,051, the Union maintains that an employer who unilaterally abandons a pre-existing arbitration proce-

---

provision of the expired agreement, the presumptions favoring arbitrability must be negated expressly or by clear implication." 430 U.S. at 255, 97 S.Ct. at 1074.

**8.** As the Board recognizes, Litton does not challenge the general principles of *Indiana & Michigan*. Litton instead contends that it was not obligated to arbitrate the layoff grievances because of language in the CBA which states that "the stipulations set forth shall be in effect for the time hereinafter specified." Litton argues that, under this general provision, the arbitration clause expired along with the rest of the contractual terms on October 5, 1979. It was clearly reasonable for the Board to conclude that this general expiration clause did not "expressly or by clear implication" negate the strong *Nolde* presumption of post-expiration survival of the contractual obligation to arbitrate. 430 U.S. at 255, 97 S.Ct. at 1074. Like the Board, the courts have consistently held that general language concerning the duration of the contract is not sufficient to show that the arbitration clause expires with the contract; there must be specific language limiting the arbitrability of post-expiration disputes. *See, e.g., Sea-*

*farer's v. National Marine Services, Inc.*, 820 F.2d 148, 154 (5th Cir.), *cert. denied*, 484 U.S. 953, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987); *Local 703, Int'l Bhd. Teamsters v. Kennicott Bros.*, 771 F.2d 300, 303 (7th Cir.1985); *Steelworkers v. Fort Pitt Steel Casting Division–Conval–Penn, Inc.*, 635 F.2d 1071, 1075–76 (3d Cir.1980), *cert. denied*, 451 U.S. 985, 101 S.Ct. 2319, 68 L.Ed.2d 843 (1981).

We also reject Litton's contention that it had no obligation to arbitrate any post-expiration grievances because of the passage of time between the expiration of the CBA and the filing of the layoff grievances. Litton relies on *Kennicott*, 771 F.2d at 303, and dicta in *Chauffeurs, Teamsters and Helpers Local Union 238 v. C.R. S.T., Inc.*, 795 F.2d 1400, 1404 (8th Cir.), *cert. denied*, 479 U.S. 1007, 107 S.Ct. 647, 93 L.Ed.2d 702 (1986), to support this argument. Although the Ninth Circuit has decided a case in which the grievance for which the union sought arbitration occurred nearly a year after the CBA expired, *O'Connor Co. v. Carpenters Local 1408*, 702 F.2d 824 (9th Cir.1983), in no way did the court indicate that the post-expiration passage of time played any role in its decision to deny arbitration. *See id.* at 825.

dure during the post-expiration or hiatus period is guilty of a refusal to bargain under *Katz.*

The parties have vigorously debated the soundness of the *Indiana & Michigan* approach to the duty to arbitrate post-expiration grievances. However, because the Board erred in concluding that the layoff grievances in this case were not arbitrable, on the ground that they did not "arise under" the expired CBA, we decline the parties' invitation to resolve their dispute over *Indiana & Michigan.* For purposes of this appeal, we assume without deciding that the Board's *Indiana & Michigan* decision is a reasonably defensible construction of the section 8(a)(5) duty to bargain.

## V

■ The Board concluded that the grievances in this case, which alleged unjust layoff in violation of seniority rights, did not "arise under" the collective bargaining agreement. The Board found that the particular grievances at issue in this case did not involve "a right worked for or accumulated over time," and that there was no indication that "the parties contemplated that such rights could ripen or remain enforceable even after the contract expired." The Board, accordingly, declined to order Litton to arbitrate the layoff grievances.

The Board contends that this decision was an exercise of its remedial discretion. We believe, however, that the Board's determination that Litton had no obligation to arbitrate the layoff grievances is a matter of statutory or contractual interpretation, rather than a remedial decision. Therefore, its decision must be upheld if "reasonably defensible," *Ford Motor Co.,* 441 U.S. at 497, 99 S.Ct. at 1849 (statutory interpretation), or if it is reasonable and not inconsistent with the Act's policies. *NLRB v. Southern California Edison Co.,* 646 F.2d 1352 (9th Cir.1981) (contract interpretation). We find that the Board's decision was unreasonable and inconsistent both with its own decisions and with the Act's policies as

interpreted by this Circuit and the Supreme Court.

The Board and the courts have had considerable difficulty trying to develop a coherent set of principles for determining when a grievance "arises under" the CBA such that an employer has a duty—under *Nolde* for purposes of section 301 actions, and now under *Indiana & Michigan* for purposes of unfair labor practice proceedings—to arbitrate a post-expiration grievance. The Board's current view is that an employer has no obligation to arbitrate a particular grievance based on post-expiration events *unless* it involves contract rights "capable of accruing or vesting to some degree during the life of the contract and ripening or remaining enforceable after the contract expires." *Indiana & Michigan,* 1986–87 NLRB Dec. (CCH) at ¶ 32,054.

Somewhat surprisingly, the Board concluded that the grievances in this case, which alleged that Litton laid off ten employees in violation of seniority rights guaranteed by a particular provision in the CBA, did not "arise under" the contract. The Board must have been looking only at the event (the layoff) that sparked the dispute, and not at the substantive contract-based rights (seniority protection against layoff) that were allegedly violated.

Since the Board handed down its Decision and Order in the instant case, it has decided at least two other cases that conflict with its "arising under" conclusion in the instant case. *United Chrome Products, Inc.,* 288 NLRB No. 130, 1987–88 NLRB Dec. (CCH) ¶ 19,436 (May 1, 1988) (dispute arising out of the application of seniority arises under the expired agreement, and is subject to mandatory arbitration, because seniority rights were worked for and accumulated over time and arguably remained enforceable after the contract expired); *UPPCO, Inc.,* 288 NLRB No. 98 (1988) (employer required to arbitrate request concerning seniority because it arose under the contract and contract did not expressly provide for expiration of the seniority provisions upon expiration of the

CBA).[9]  Both of these cases mitigate in favor of reversing the Board's decision not to compel Litton to arbitrate the grievances at issue in this case.

There is a further conflict between the Board's standard in *Indiana & Michigan,* and the standard applied in this Circuit in section 301 actions to determine when a grievance "arises under" the expired CBA so as to create a duty to arbitrate.  Recently this court rejected an argument that only grievances based on " 'rights undeniably *accruing* under [the] contract *prior to termination*' are covered by the post-termination duty to arbitrate."  *Local Jt. Exec. Bd. of Las Vegas Culinary Workers Union, Local 226 v. Royal Center, Inc.,* 796 F.2d 1159, 1163 (9th Cir.1986) (emphasis in original), *cert. denied,* 479 U.S. 1033, 107 S.Ct. 881, 93 L.Ed.2d 835 (1987).[10]  In *Royal Center* we construed much more expansively the *Nolde* presumption of arbitrability of post-expiration grievances; rather than focusing on a narrow concept such as "accrual," the court centered its analysis on *"preserving the original intent of the parties"* as to whether a particular type of grievance would have been arbitrable if circumstances unanticipated by the parties when the agreement was drafted had not arisen.  796 F.2d at 1163 (emphasis in original).

The *Royal Center* approach is consistent with that of other Ninth Circuit cases.  *See George Day Construction Co. v. United Bhd. of Carpenters and Joiners of America, Local 354,* 722 F.2d 1471, 1478 (9th Cir.1984) (observing, in dicta, that post-expiration grievances are arbitrable if union can point clearly to a contractual provision that it claims was violated by the employer); *O'Connor v. Carpenters Local Union No. 1408,* 702 F.2d 824, 825 (9th Cir.1983) (employer had no duty to arbitrate post-termination grievance because parties had not agreed that it would be subject to arbitration after expiration of the CBA, and because the dispute "was not covered by [the] contract").

The *Royal Center* analysis is also consistent with that of *Nolde* itself.  In *Nolde,* the Supreme Court did not directly rely on the accruability of the right asserted in concluding that the severance pay grievance at issue in that case was arbitrable.  Instead, the Court viewed the grievance as "arising under" the expired contract because it "hinge[d] on the interpretation ultimately given the contract clause."  430 U.S. at 249, 97 S.Ct. at 1070.  Indeed, the *Nolde* Court held that "where the dispute is *over a provision of the expired agreement,* the presumptions favoring arbitrability must be negated expressly or by clear implication."  *Id.* at 255, 97 S.Ct. at 1074 (emphasis added).

Because of the conflicts within the Board's own cases in applying its test for determining when a post-expiration grievance "arises under" the CBA so as to give rise to a duty to arbitrate, and between the Board and Ninth Circuit precedent on the same issue, we hold that the Board's conclusion that the layoff grievance in this case did not "arise under" the CBA is unreasonable and must be reversed.

## VI

The Board reasonably concluded that the layoff was a mandatory subject of bargain-

---

**9.**  In his brief and at oral argument, the General Counsel's representative attempted to distinguish the Board's *UPPCO* and *United Chrome Products* cases saying that the seniority provision at issue in the instant case is not absolute.  Rather, he asserted, a Litton employee enjoys seniority protection against layoff only "if other things such as aptitude and ability are equal."  This is not a distinction made by the Board, and we do not know whether the Board would impose such a distinction.  *See Local Union No. 2338, Int'l Bhd. Electrical Workers v. NLRB,* 499 F.2d 542, 544 (D.C.Cir.1974) ("reasons for Board action are to be supplied by the Board, and not by counsel as its surrogate"); *see also SEC v. Chenery Corp.,* 318 U.S. 80, 87–89, 63 S.Ct. 454,

459–60, 87 L.Ed. 626 (1943); *SEC v. Chenery Corp.,* 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

In the absence of a Board decision explaining why consideration of "aptitude and ability" prevent arbitrability, we refuse to make such a distinction.

**10.**  The *Royal Center* court also observed, in passing, that the Supreme Court has referred to arbitration a dispute over contractual seniority rights.  *See Piano & Musical Instrument Workers, Local 2549 v. W.W. Kimball Co.,* 333 F.2d 761 (7th Cir.), *rev'd per curiam,* 379 U.S. 357, 85 S.Ct. 441, 13 L.Ed.2d 541 (1964).

ing and that Litton, therefore, violated sections 8(a)(5) and 8(a)(1) by refusing to bargain about the layoff decision. To this extent, the Board's order will be ENFORCED.

The Board's conclusion that Litton had neither a statutory nor a contractual obligation to arbitrate post-expiration grievances alleging unjust layoffs "out of seniority," however, is inconsistent with Supreme Court, Ninth Circuit, and its own recent case law. Accordingly, the portion of the Board's order by which it declined to order arbitration of the layoff grievances is REVERSED, and the cause REMANDED for further proceedings in accordance with this opinion.